**Affirmed and Memorandum Opinion filed February 27, 2024.**



In The

# Fourteenth Court of Appeals

## NO. 14-22-00143-CR

### BABATUNDE MOSOPE ADENIYI, Appellant

### V.

### THE STATE OF TEXAS, Appellee

**On Appeal from the 268th District Court
Fort Bend County, Texas
Trial Court Cause No. 19-DCR-089609**

## M E M O R A N D U M   O P I N I O N

Appellant Babatunde Mosope Adeniyi appeals his conviction for criminally negligent homicide, contending that there is insufficient evidence to support the jury's guilty verdict. After a thorough review of the record, we conclude that sufficient evidence supports his conviction. Accordingly, we overrule his sole issue and affirm the trial court's judgment.

## Background

A Fort Bend County grand jury indicted appellant for the felony offense of manslaughter. The indictment alleged that appellant "on or about November 06, 2019, did then and there recklessly cause the death of an individual, namely Craig Hill, hereinafter called the Complainant, by impeding the normal breathing and circulation of the Complainant by applying pressure to the Complainant's neck."

Appellant worked as a direct care staff worker at Unique Manor and Rehab, a company that provided group residential placement and home services for individuals with special needs, including intellectually or developmentally disabled ("IDD") persons. Unique operated three group homes, including one located on LaGloria Drive (the "LaGloria Home") in Fort Bend County. Ordinarily, appellant worked at Unique's day habitation ("day-hab") facility,[1] where the group home residents spent their weekdays engaging in various activities. Occasionally, he provided coverage at the group homes. Bernadette Keke, a registered nurse, owned and operated Unique and was the company's CEO and program director. Other employees of Unique included Uchenna Eboh, Tierra Wright, Adrienne Spencer, and David Haywood, who supervised the group homes.

Craig Hill, a 21-year-old male with IDD and diagnoses of paranoid schizophrenia and bipolar disorder, resided at the LaGloria Home and participated in activities at the day-hab. Hill had the intellectual level of an eight- to ten-year-old child and was known to be physically and verbally aggressive with staff and other residents. He previously caused property damage, left the group home without permission, and assaulted other employees. Because of Hill's particular aggressive behavior, Unique provided special training for staff members and a support plan was

_____

[1] The day-hab was located on Bissonnet Street in Houston.

2

specifically designed to address Hill's behavioral issues. The support plan was used to train all staff members working in the group homes, including appellant. Because Hill could be aggressive and violent, staff members were trained to use verbal redirection with him, speaking to him politely and avoiding the use of "hard" or "harsh" voices. Staff members were also trained to allow Hill to practice his "karate moves," which he often demostrated but had not directed toward staff or other residents. If Hill engaged in any aggressive behavior, staff members were not to touch or be physical with Hill but rather call 911 so police could come and assist.

Unique had a general policy of responding to combative or physical residents: staff members were to lock themselves and other residents in a room and call a supervisor or 911 if the staff member felt threatened. Unique trained staff members to refrain from engaging in physical interactions with residents, including avoiding obstructing a resident's airway or impeding a resident's breathing. Although the State of Texas allowed physical restraint, Unique had a "zero restraint" policy that was repeatedly communicated to staff.

Among other instruction, appellant received specific training in Unique's zero restraint policy, as well as the policies prohibiting touching residents or obstructing or impeding residents' airways. He was taught to use verbal redirection or to call 911 if he felt threatened; in fact, he had previously called 911 during an incident unrelated to Hill. Appellant was also trained on Hill's behavioral support plan. He had consistent interactions with Hill at the day-hab and at the LaGloria Home. He was aware of and familiar with Hill's signs of aggression from their previous interactions.

On November 6, 2019, appellant worked his normal daily shift at the day-hab facility. Wright asked appellant to cover her evening shift at LaGloria because she was unable to work due to a family issue. Appellant agreed and informed Keke.

3

Keke instructed appellant to call a supervisor to get someone to relieve him because he was scheduled to work at the day-hab the next day. Appellant transported three residents, including Hill, to the LaGloria Home.

At around 6:30 p.m., appellant called Haywood to tell him he had some trouble with Hill. Appellant told Haywood that Hill caused some property damage and that there was some blood on Hill's head. Appellant assured Haywood that everything was calm at that point, but asked to go home because he wanted to tend to an injury to his lip. Haywood told appellant he would send Eboh from one of the other group homes to relieve him and instructed appellant to take Eboh's residents back to the other group home until Haywood could get someone to relieve appellant.

According to Eboh, he started work at 4 p.m. on November 6. He went to the day-hab to pick up the residents who lived at one of Unique's other group homes. At around 7:30 p.m., Eboh received a call from Haywood instructing him to take the residents from his group home and go to LaGloria to see what was happening there. About fifteen minutes later, Eboh entered the LaGloria Home, finding appellant calmly sitting on a couch in the living area and Hill lying nearby on the floor. When Eboh asked appellant about Hill, appellant said Hill was sleeping. Eboh thought it was unusual to see Hill on the floor, but appellant told Eboh not to touch him.

Eboh went outside and called Haywood, telling him that Hill was lying on the floor. Eboh saw Wright and Spencer arrive at the LaGloria Home. When he re-entered the home, he saw appellant splashing water on Hill's face and shouting for someone to help because Hill was not breathing. Appellant turned Hill over, and Eboh saw that Hill had blood on his nose; he was "almost stiff" when Eboh touched him. According to Eboh, appellant started performing CPR but stopped after a few minutes and went outside. Appellant told Eboh that Haywood instructed appellant to take Eboh's group home residents back home, so appellant left with them.

4

Because Wright and Spencer were at the LaGloria Home, Eboh decided to go home, but he later gave a statement to police. Eboh did not observe any injuries on appellant, but his attention was focused on Hill, rather than appellant. Although appellant told Eboh that Hill had been fighting with appellant, appellant did not mention that he had been hit with anything or that he was hurt or injured.

According to Wright, on the evening of November 6, appellant called her requesting assistance because Hill was being aggressive and wanted to fight. Appellant did not tell Wright that he had been assaulted. Wright decided it was not necessary to call 911, but she decided to go to the LaGloria Home. She picked up Spencer, who was the team leader for one of the other group homes, on the way. When Wright entered LaGloria, she saw appellant sitting on the couch with his head in his hand, and she saw Hill lying on the floor. Appellant told her Hill hit him with a piece of wood, and she saw a scratch on appellant's head.

When Wright arrived, Eboh was serving the other residents dinner. Wright checked on Hill, and when she turned him over, she saw that his lips were dark blue or purple. She did not think he was breathing, became upset, and briefly went outside to gather herself. When she returned, she said someone needed to call 911, and she started performing CPR on Hill. Appellant used his phone to call 911, but then handed his phone to Wright. Emergency responders arrived about 15 to 20 minutes after the 911 call, and they instructed Wright to wait outside. By the time they arrived, appellant had already left. Law enforcement officers asked Wright to contact appellant and have him return to the scene. After appellant returned, Wright saw him sitting in the back of an ambulance.

Fort Bend County Sheriff's Office patrol officer Carlos Campos was the first law enforcement officer to arrive at the scene. Officer Campos interviewed appellant upon his return to the LaGloria Home. Appellant said that he and Hill

5

were involved in a physical altercation during which Hill used a piece of wood. Appellant also said that Hill struck one of the other residents with the wood. Appellant explained that he tried to restrain Hill, but he stated that he never hit Hill. After Officer Campos spoke with him, appellant was transported to a nearby hospital for medical attention.

After being released from the hospital, law enforcement officers transported appellant to the sheriff's office. There, Detectives John Miller and Christopher Arias met with appellant because appellant said he wanted to provide a statement. Although appellant was not under arrest, Detective Arias informed him of his rights before the interview.

During the recorded interview, appellant told the detectives that he was mopping the floor when Hill tried to attack appellant and another resident with sticks. According to appellant, Hill said he was going to kill everyone in the house. Appellant described the largest stick used by appellant as being as thick as appellant's wrist. Appellant stated that Hill hit him with these sticks "seriously hard," "so many times."[2] When Detective Arias asked appellant where the sticks were, appellant was unclear about what happened to them and later suggested that Eboh might have removed them.

According to appellant, he physically struggled with Hill, and they both fell to the floor. Appellant began restraining Hill, who dropped the sticks. Appellant said he called Haywood while he was on the floor restraining Hill's arm behind his

---

[2] Appellant claimed that Hill hit his head, neck, chest, and back with the sticks. However, Detective Arias testified that the only injuries that he saw on appellant, who lifted his shirt, were two scrapes on his head. Photographs of appellant taken at the sheriff's office were admitted into evidence. One photograph depicts a small scrape-like injury to appellant's head, and another photograph shows a small scrape on one of appellant's arms. None of the other pictures depict visible injuries.

6

back. Appellant claimed that he restrained Hill until Hill became calm and said he did not want to fight anymore. Appellant said he crawled away from Hill and called Wright. Then, according to appellant, he sat down and waited for Eboh to arrive.

Detective Arias asked appellant whether he choked Hill, and appellant initially denied doing so. Later in the interview, however, appellant admitted to choking Hill. After this admission, appellant became very emotional, stating that he did not mean to hurt Hill and repeatedly asking, "What have I done?" The detectives asked appellant several times how long he choked Hill, but appellant did not know and was incredibly distraught and difficult to understand. Because appellant was inconsolable and emotional, the officers ended the interview. After the interview, the detectives arrested appellant for murder.

Detective Arias knew that a crime scene officer went to the LaGloria Home on the night of the incident and collected evidence, including some sticks, from inside the residence. A few days after the incident, Detective Arias went to LaGloria and collected some additional sticks from the yard. Detective Arias testified that none of the collected sticks had a width the size of a wrist. The sticks themselves— both those from inside the house and those from the yard—were admitted into evidence and shown to the jury. Additionally, according to Detective Arias, appellant did not specify whether he was in fear for his life or trying to defend himself during the incident with Hill.[3]

The medical examiner who performed the autopsy on Hill testified that he suffered injuries consistent with a recent choke hold while lying face down on the floor. She opined that Hill's death resulted from "mechanical asphyxiation" caused

---

[3] During the recorded interview, the detectives assured appellant that they knew he was not a bad guy and was only trying to protect the other residents. According to Detective Miller, they did so in an effort to get appellant to disclose what had really happened on November 6.

by manual strangulation around the neck, consistent with a choke hold, and that the manner of Hill's death was homicide.

At the close of evidence, the trial court instructed the jury on the charged offense of manslaughter and the lesser-included offense of criminally negligent homicide. The court also instructed the jury on self-defense and defense of a third party. The jury returned a guilty verdict for the lesser-included offense of criminally negligent homicide, and the trial court sentenced appellant to twenty-four months' confinement in the Texas Department of Criminal Justice – State Jail Division.[4] Appellant timely appealed.

## Analysis

In his sole issue, appellant contends that the evidence is legally insufficient to prove beyond a reasonable doubt that he ignored an obvious risk or that he did not act in self-defense. We address each of these contentions in turn, beginning with the standard of review.

## A.    Standard of Review

In determining whether the evidence is legally sufficient to support a conviction, "we consider all the evidence in the light most favorable to the verdict and determine whether, based on that evidence and reasonable inferences therefrom, a rational juror could have found the essential elements of the crime beyond a reasonable doubt." *Hooper v. State*, 214 S.W.3d 9, 13 (Tex. Crim. App. 2007) (citing *Jackson v. Virginia*, 443 U.S. 307, 318-19 (1979)). We presume that the jury resolved conflicting inferences in favor of the verdict, and we defer to its

---

[4] Criminally negligent homicide is a state jail felony, which carries a maximum punishment of confinement for any term not more than two years or less than 180 days. *See* Tex. Penal Code §§ 12.35, 19.05. Because appellant had already been in jail for more than twenty-four months, the trial court sentenced appellant to two years, with credit for the full time served.

determination of the evidentiary weight and witness credibility. *See Braughton v. State*, 569 S.W.3d 592, 608 (Tex. Crim. App. 2018); *Criff v. State*, 438 S.W.3d 134, 136-37 (Tex. App.—Houston [14th Dist.] 2014, pet. ref'd). We consider both direct and circumstantial evidence, as well as any reasonable inferences that may be drawn from the evidence. *See Balderas v. State*, 517 S.W.3d 756, 766 (Tex. Crim. App. 2016). Circumstantial evidence is as probative as direct evidence in establishing the guilt of an actor, and circumstantial evidence alone can be sufficient to establish guilt. *See Hooper*, 214 S.W.3d at 13.

We likewise review the legal sufficiency of the evidence to support a jury's rejection of a self-defense claim under the familiar *Jackson v. Virginia* standard. *See Martinez v. State*, 633 S.W.3d 698, 704 (Tex. App.—Houston [14th Dist.] 2021, pet. ref'd). The State is not required to produce evidence to refute a defendant's self-defense claim. *Zuliani v. State*, 97 S.W.3d 589, 594 (Tex. Crim. App. 2003). Instead, it is the defendant's burden to produce some evidence in support of his self-defense claim. *Id.* Once the defendant produces such evidence, the State then has the ultimate burden of persuasion to disprove it. *See id.* The burden of persuasion does not require that the State produce evidence disproving the defense; rather, it requires that the State prove its case beyond a reasonable doubt. *See id.*; *Saxton v. State*, 804 S.W.2d 910, 913 (Tex. Crim. App. 1991). If the jury find the defendant guilty, it implicitly rejects his self-defense theory. *Zuliani*, 97 S.W.3d at 594; *Saxton*, 804 S.W.2d at 914.

## B. Discussion

### 1. *Sufficient evidence supports criminally negligent homicide.*

A person commits criminally negligent homicide if he causes the death of an individual by "criminal negligence." Tex. Penal Code § 19.05(a). The Legislature defines the culpable mental state for criminal negligence as follows:

A person acts with criminal negligence, or is criminally negligent, with respect to circumstances surrounding his conduct or the result of his conduct when he ought to be aware of a substantial and unjustifiable risk that the circumstances exist or the result will occur. The risk must be of such a nature and degree that the failure to perceive it constitutes a gross deviation from the standard of care that an ordinary person would exercise under all the circumstances as viewed from the actor's standpoint.

*Id.* § 6.03(d). Thus, a legally sufficient showing of criminally negligent homicide requires the State to prove that: (1) the defendant's conduct caused the death of an individual; (2) the defendant ought to have been aware that the conduct created a substantial and unjustifiable risk of death; and (3) his failure to perceive the risk constituted a gross deviation from the standard of care an ordinary person would have exercised under similar circumstances. *See Queeman v. State*, 520 S.W.3d 616, 622 (Tex. Crim. App. 2017) (citing *Montgomery v. State*, 369 S.W.3d 188, 192 (Tex. Crim. App. 2012); Tex. Penal Code §§ 6.03(d), 19.05(a)). The circumstances must be viewed from the standpoint of the defendant at the time the allegedly negligent act occurred. *Id.* at 623.

The jury heard evidence that appellant received training on Unique's zero restraint policy and knew that employees were not to "put hands" on residents. He was instructed on techniques to handle aggressive or physical behavior, such as verbal redirection or secreting himself and other residents and calling 911. Appellant had previously called 911 for assistance during an unrelated incident.

Direct care workers at Unique, including appellant, knew that Hill had a history of acting out aggressively and physically. Appellant and other employees were trained on the specific behavioral support plan developed to address Hill's behavior. Appellant was aware from his training that he was not to put hands on Hill or to restrain him in any way. He was aware of and trained in responding to

10

Hill's aggressive or physical behavior, knowing that he had the options of calling 911 or a supervisor if Hill became aggressive or threatening. Further, appellant and other workers were instructed that no caretaker could obstruct a resident's airway or impede a resident's breathing.

Based on the evidence, a rational jury could reasonably conclude that appellant ought to have been aware of the substantial and unjustifiable risk that choking Hill could result in his death, but that appellant failed to perceive this risk. A rational jury could also reasonably conclude from the evidence that the failure to perceive this risk was a gross deviation from the standard of care an ordinary person would exercise under the circumstances as viewed from appellant's perspective. Thus, we conclude the evidence is legally sufficient to support the jury's verdict of criminally negligent homicide. *See Queeman*, 520 S.W.3d at 623; *cf. Thompson v. State*, No. 14-18-00992-CR, 2020 WL 3968033, at *5-6 (Tex. App.—Houston [14th Dist.] July 14, 2020, pet. ref'd) (mem. op., not designated for publication) (placing a person in a chokehold is an act clearly dangerous to human life); *Jackson v. State*, No. 01-11-00772-CR, 2013 WL 396264, at *5 (Tex. App.—Houston [1st Dist.] Jan. 31, 2013, pet. ref'd) (mem. op., not designated for publication) (choking someone is an act clearly dangerous to human life). We overrule this part of appellant's sole issue.

2. *Jury reasonably rejected appellant's self-defense claim.*

Appellant also claims that the State failed to disprove self-defense or defense of a third person:

> The evidence was clear that the deceased was violent, was incarcerated in the past in both jail and in the psychiatric facilities nearby. He was behaving very aggressively that evening. With other disabled people at risk, how was the Appellant supposed to respond? He could not abandon them to the behavior of a known highly aggressive and large

11

young male, armed with clubs or sticks, regardless of the person's disability or mental health, or he could try to restrain that person as best he could.

The State never proved that [appellant] ignored an obvious risk. Nor did it *disprove* that he was within his rights to defend himself and the other residents of the group home. Tragedy is not a cause for a prison sentence. That merely compounds the tragedy. . . .

There was never any evidence at all that the Appellant acted with malice toward the younger man, nor that he did anything other than try to stop an obviously unbalanced person from hurting himself or others.

Under section 9.31 of the Penal Code (the non-deadly force self-defense statute), a person is justified in using force against another when and to the degree that person reasonably believes the force is immediately necessary to protect himself against another person's use or attempted use of unlawful force. Tex. Penal Code § 9.31(a). Under section 9.32(a), a person is justified in using deadly force if he would be justified in using force under section 9.31, and he reasonably believes that deadly force is immediately necessary to protect himself against another's use or attempted use of deadly force. *Id.* § 9.32(a)(2). Finally, under section 9.33, a person is justified in using force or deadly force against another to protect a third person if he would be justified under section 9.31 or 9.32 in using force or deadly force to protect himself against the unlawful force or deadly force he reasonably believes to be threatening the third person he seeks to protect, and he reasonably believes that his intervention is immediately necessary to protect the third person. *Id.* § 9.33. The "reasonably believes" language contains both subjective and objective components: a defendant must subjectively believe that another person used or attempted to use unlawful force (section 9.31) or deadly force (section 9.32) against the defendant and the defendant's use of unlawful or deadly force in response was immediately necessary. *Lozano v. State*, 636 S.W.3d 25, 32 (Tex. Crim. App. 2021) (citing *Werner v. State*, 711 S.W.2d 639, 645 (Tex. Crim. App. 1986); *Semaire v. State*, 612

S.W.2d 528, 530 (Tex. Crim. App. 1980)).  Additionally, the defendant's subjective belief must be reasonable, which is a belief held by an "ordinary and prudent man in the same circumstances as the actor." *Id.*; Tex. Penal Code § 1.07(a)(42).  The jury received jury charge instructions consistent with this law.

As noted above, the State's burden of persuasion does not require that it produce evidence disproving self-defense; rather, it requires that the State prove its case beyond a reasonable doubt.  *See Zuliani*, 97 S.W.3d at 594; *Saxton*, 804 S.W.2d at 913.  By finding appellant guilty of criminally negligent homicide, the jury implicitly rejected his self-defense claim, *see Zuliani*, 97 S.W.3d at 594; *Saxon*, 804 S.W.2d at 913, and we have already determined that the jury's verdict is supported by legally sufficient evidence.

Further, appellant did not testify at trial and no other witnesses testified as to Hill's attack on appellant, whether it involved a use or attempted use of deadly force, or whether there existed an immediate need for appellant to defend himself or anyone else.  During his interview with detectives shortly after the incident, appellant never claimed that he was fearful for his life or that he was defending himself or another.  Although the jury may have inferred from appellant's interview with detectives that appellant was acting to protect himself or the residents, there was no evidence from which the jury could determine that appellant reasonably believed the use of deadly force was immediately necessary to defend against another's use or attempted use of deadly force.[5]  *See* Tex. Penal Code §§ 9.31, 9.32, 9.33 (person is justified in

---

[5] Although appellant stated during his interview that Hill threatened to kill everyone in the house, appellant also stated that Hill had made such threats before.  The evidence established that Hill—a person with IDD and an intellectual level of an eight- to ten-year-old child—had a history of making similar threats but not acting on them.  Finally, the charge stated that the use of force

using force or deadly force against another only when actor reasonably believes such force is immediately necessary to protect himself or a third party); *cf. also Lozano*, 636 S.W.3d at 32-33 (explaining that a jury may only acquit a defendant based on self-defense when there is evidence that the defendant reasonably believed the use of deadly force was immediately necessary). Accordingly, appellant has not demonstrated that the jury's rejection of his defensive theory was unreasonable.

We overrule appellant's legal-sufficiency challenge.

## Conclusion

Having overruled appellant's sole issue, we affirm the trial court's judgment.

/s/      Kevin Jewell
        Justice

Panel consists of Justices Jewell, Poissant, and Wilson.

Do Not Publish — Tex. R. App. P. 47.2(b).

---

against another is not justified in response to verbal provocation alone. *See* Tex. Penal Code § 9.31(b)(1) (use of force is not justified in response to verbal provocation alone).

Appellant also claimed that Hill hit him and one of the residents with at least one stick as thick as appellant's wrist. But appellant had only a small visible scrape on his head, there was no evidence of any injury to any of the residents, and the sticks found at the scene were much smaller in diameter than appellant described. These sticks were admitted into evidence and shown to the jury. Thus, the jury reasonably may have rejected appellant's self-defense claim because it did not believe that Hill was using or attempting to use deadly force against appellant or the LaGloria Home's residents. *See id.* § 9.32(a)(2) (defendant must reasonably believe deadly force is immediately necessary to protect against the other's "use or attempted use of unlawful deadly force").

14